1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   LAKQUAN D. SOLOMON,                     No. 2:24-CV-0924-TLN-DMC-P

12                     Petitioner,

13        v.                                 <u>FINDINGS AND RECOMMENDATIONS</u>

14   PATRICK COVELLO,

15                     Respondent.

16

17            Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18   habeas corpus under 28 U.S.C. § 2254. Pending before the Court are Petitioner's first amended

19   petition for a writ of habeas corpus, ECF No. 11, and Respondent's answer, ECF No. 21.

20   Petitioner has not filed a traverse.

21            Because this action was filed after April 26, 1996, the provisions of the

22   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.

23   <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Calderon v. United States Dist. Ct.</u> <u>(Beeler)</u>, 128

24   F.3d 1283, 1287 (9th Cir. 1997), <u>cert.</u> <u>denied,</u> 522 U.S. 1099 (1998). Under AEDPA, federal

25   habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

26   state court proceedings unless the state court's adjudication of the claim:

27                     (1) resulted in a decision that was contrary to, or involved an unreasonable
                       application of, clearly established Federal law, as determined by the
28                     Supreme Court of the United States; or

                                              1

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal

2

1  habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the

2  error had a substantial and injurious effect on the verdict, or was harmless.  See id.

3          State court decisions are reviewed under the far more deferential "unreasonable

4  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

5  unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

6  510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

7  that federal habeas relief may be available under this standard where the state court either

8  unreasonably extends a legal principle to a new context where it should not apply, or

9  unreasonably refuses to extend that principle to a new context where it should apply.  See

10  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

11  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

12  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

13  75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even

14  where the federal habeas court concludes that the state court decision is clearly erroneous. See

15  Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

16  deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

17  As with state court decisions which are "contrary to" established federal law, where a state court

18  decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

19  unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

20          The "unreasonable application of" standard also applies where the state court

21  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

22  848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).   Such decisions

23  are considered adjudications on the merits and are, therefore, entitled to deference under the

24  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982.

25  The federal habeas court assumes that state court applied the correct law and analyzes whether the

26  state court's summary denial was based on an objectively unreasonable application of that law.

27  See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

28  / / /

# I. BACKGROUND

A. **Facts**

In its opinion on direct review, the California Court of Appeal recited the following facts, referring to Petitioner as "defendant":

> The People's amended information charged defendant with first degree murder (§ 187, subd. (a)—count one); discharge of a firearm from a vehicle (§ 26100, subd. (c)—count two); and being a felon in possession of a firearm. (§ 29800, subd. (a)(1)—count three.) The information further alleged that counts one and two had been committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)) and that during the commission of these counts, a principal had personally and intentionally discharged a firearm causing great bodily injury. (§ 12022.53, subds. (d) & (e)(1).) [FN2] Finally, the information alleged defendant had been convicted of a serious felony (§ 667, subd. (a)) and had suffered a prior strike. (§ 667, subds. (b)-(i).)
>
> [FN2] The information also alleged, as to count one only, violations of subdivisions (b) and (c) of section 12022.53
>
> Before trial, the trial court denied defendant's request to bifurcate the gang enhancement allegations, finding that the People's theory of the case included gang motivation and bifurcating the gang evidence would improperly restrict the People's presentation of their case. Thereafter, the matter, with the exception of the status enhancements, was tried by a jury.
>
> A.    *The murder and general investigation*
>
> At trial, the People presented evidence that the victim, Brandon Campbell, stored some of his belongings at the home of J. Johnson in South Sacramento. In September 2017, South Sacramento was experiencing a lot of gang violence. On September 27, 2017, Johnson and Campbell planned to meet up. Campbell got off work around 8:47 p.m. Campbell was to get some marijuana and then go to Johnson's house, since she had a headache and did not want to pick him up, as had been originally planned. Johnson fell asleep waiting for Campbell and awoke to a loud bang. She got out of bed and looked out her window, which did not face the street, but did not see anything. Around this time, approximately 3:00 a.m. on September 28, she received a phone call from Campbell. There was no one on the line when she answered the phone, and Campbell did not respond when she texted him. Unaware that anything was wrong, Johnson got back in bed. Approximately four minutes later, she was told Campbell had been shot, and she called 911.
>
> On the night in question, D.B. lived with Johnson and had her upstairs bedroom window open. Through that window she heard a car drive past, and Campbell speaking with a male whose voice she did not recognize. That voice said, "Ayy," or "[H]ey." D.B. then heard the car turn around, and the voice again said, "[H]ey."[FN3] D.B. could not hear the specifics of the conversation. She then heard a loud bang and the car left. D.B. thought it was a gunshot, so she dropped to the floor and made her way downstairs to the living room. She looked outside and saw

Campbell lying in the street and his bicycle on the sidewalk in front of the house. She went outside and saw him take a few breaths before he stopped breathing.

[FN3] D.B. had some familiarity with older vehicles because she had family members who were auto mechanics, and opined the vehicle had been an older car of some kind, and definitely was not a truck or SUV.

The ShotSpotter system detected a single gunshot in that area at 3:00 a.m. on September 28, 2017, and officers were dispatched to the scene.[FN4] Campbell was still lying in the street when officers arrived at 3:09 a.m. and, following attempts to resuscitate him, he was pronounced dead at the scene at 3:20 a.m. Campbell had suffered a gunshot wound to his left shoulder, which appeared to be caused by a shotgun fired at close range. Campbell's cell phone, wallet, and a backpack containing, among other things, an airsoft gun and marijuana, were found near his body. There was a skid mark behind the tire of Campbell's bicycle consistent with a sudden stop.

[FN4] The ShotSpotter system detects the location of a gunshot to within the width of a football field.

Campbell's autopsy confirmed he died of a shotgun wound to the left shoulder and that there was no soot or stippling as would be expected if the barrel had been close to the skin when fired. Triple-aught shotgun pellets in a tight grouping were recovered from his body. A shotgun "wad" recovered near the body was consistent with 12-gauge ammunition. The wad's placement was consistent with a close-range shooting.

Surveillance camera footage from near the scene showed the victim riding his bicycle at 2:57 a.m. Around this time, that footage also showed a maroon Buick LeSabre that made a U-turn and then sped away 12 seconds after the ShotSpotter identified a gunshot. The driver was wearing a black shirt with a white circle and the letter "C" in the middle. On the back passenger side of the Buick was a spare tire. Less than a minute after the shooting, the Buick turned from the street where the shooting occurred onto Franklin Boulevard. Authorities tracked the Buick's route with traffic cameras, which showed it heading in the direction of defendant's home. The license plate was collected from a plate reader on Florin Road.

In order to link the Buick to defendant, the People presented evidence that the Buick was registered to defendant's mother and, nine days before the murder, defendant had been in an accident while driving that car. Further, defendant was recorded on September 27, the day before the murder, arriving at a tire store in Vacaville in the Buick and then at a gas station in Hercules with D. Carter. Defendant was wearing a black hooded sweatshirt with the word "Cookie" in white letters and a white circle with the letter "C" in black. Defendant changed the rear passenger tire after his significant other, K. Williams, [FN5] brought him a spare and defendant left the gas station in the Buick at approximately 10:39 p.m. The parties stipulated Williams told authorities that defendant was the individual in the Cookie sweatshirt in Hercules and admitted this shirt looked similar to the shirt from surveillance footage near the murder. She also identified the car in the surveillance footage as belonging to defendant.

5

[FN5] Williams and defendant were in a dating relationship, had a child together, and referred to each other as husband and wife even though they were not married.

The People further presented evidence that after September 28, the Buick's license plate was not read again by a plate reader until November 20, 2017. On that day, authorities located the Buick and surveilled it. Around noon that day, defendant and Williams arrived where the Buick had been left in North Sacramento and attempted unsuccessfully to start it with a new battery. They left in the vehicle in which they had arrived and were pulled over by an officer, who collected their phones. A search of the Buick revealed (1) a receipt from a tire company with defendant's name, address, and phone number; (2) a red light camera ticket with defendant listed as the driver, including a photo of defendant driving; and (3) a San Francisco parking ticket dated the day of the homicide. The spare tire was still on the car.

Forensic testing on the Buick showed the highest concentration of gunshot residue on the driver's side headliner, although testing could not determine when it was deposited there. Residue in that location suggested a gun was fired from the car. The Cookie sweatshirt was not recovered in police searches, nor did a search of defendant's home produce a shotgun or shotgun shells. However, police did find a bag in defendant's bedroom with the same Cookie emblem as the sweatshirt.

B.     *The gang evidence*

In accordance with the People's theory that the crime was a retaliatory gang killing, the People called Detective Justin Saario with the Sacramento Police Department to testify as an expert concerning "African[-]American gangs, specifically the Oak Park Bloods." Detective Saario recounted the history of the three main "Bloods" gangs in the Sacramento area and their related subsets. This included the ongoing rivalry between neighborhoods claimed by the different gangs. Defendant was a member of the area's largest gang, the Oak Park Bloods. [FN6] The primary enemy of the Oak Park Bloods was the G-Mobb, which claimed the area of G-Parkway. Campbell grew up in G-Parkway and Detective Saario considered him an associate of that gang.

[FN6] While defendant denied his continued membership, Detective Saario based his opinion that defendant was a current member on his review of reports, as well as defendant's tattoos, associations, social media, jail calls, and information retrieved from defendant's cell phone.

The Oak Park Bloods and the G-Mobb had been feuding for at least 20 years. However, gang violence had increased in the years leading up to the homicide at issue in the case, and there was an active gang war in the summer of 2017 requiring Oak Park Bloods members to be armed. If such members were in rival gang territory, they were likely to conduct drive-by shootings. Gang-related violence was prevalent in South Sacramento in September 2017. The location of the murder established that it occurred in G-Mobb territory in South Sacramento.

To demonstrate these hostilities, Detective Saario described a series of gang-related shootings occurring in 2016 and 2017 suspected to have been committed by warring gangs. Included with these was a murder on July 12, 2017, wherein Keyshawn Deams (a validated member of the

Oak Park Bloods) was shot in a house by someone in a black vehicle. Deams exited the house, shooting back. Defendant heard this shooting from a few houses away and took Deams to the hospital in the Buick. Further, on September 26, 2017, a home invasion robbery by T.W., D. Walker (a validated Oak Park Bloods member), and B. Stewart went awry when the homeowner shot T.W. and Stewart, resulting in T.W.'s death.

Detective Saario opined the primary activities of the Oak Park Bloods included robbery, weapon possession, burglary, and various shooting offenses, including assault with a deadly weapon, attempted murder, murder, and shooting into an inhabited dwelling or vehicle. Detective Saario further testified to two predicate offenses by the Oak Park Bloods. First, on June 2, 2013, Q.C. was convicted of assault by force likely to produce great bodily injury and sale of methamphetamine with a gang enhancement. Second, on March 21, 2014, T. Patterson was convicted of being a felon in possession of a gun. Finally, based upon a hypothetical partially mirroring the facts of this case, Detective Saario opined the murder would benefit the Oak Park Bloods because, as an act of retaliation committed in rival territory, it would respond to the previous disrespect by the rival gang and would increase the reputation of the Oak Park Bloods gang and show they were capable of carrying out such attacks.

C. *Further evidence of motive and defendant's knowledge of the shooting*

In addition to the expert gang evidence discussed above, the People presented evidence that T.W., who was killed September 26, 2017, was defendant's 15-year-old friend. The next morning, which was also the day before the murder, defendant texted Williams, stating his " 'little bro' " had been killed during a robbery and how " 'been stressing.' " At 11:45 p.m. on September 27, Williams asked defendant to call her so that she would know he made it home safely. However, they did not have any communication until 10 a.m. September 28, and shortly thereafter defendant texted her to "[c]heck Fox 40 shooting by Valley Hi," and then added, "[t]his morning." [FN7] Following a short conversation, Williams again texted defendant, relating that she did not need to know everything but that she wanted to know he was alright. The murder was in the area of Valley Hi.

[FN7] A review of defendant's phone records showed his phone had either been turned off or had a dead battery between 11:45 p.m. on September 27, 2017, and 5:53 a.m. on September 28, 2017.

Thereafter, Williams searched Facebook for the victim on September 29, 2017, and defendant searched Google for the Valley Hi shooting four times between September 28 and 30, 2017. Carter, who was with defendant the day of the murder and a validated Oak Park Bloods gang member, also tried to livestream Fox News at 3:45 a.m. approximately 45 minutes after the shooting and before homicide detectives had even been dispatched to the scene. Defendant also communicated with U. Williams, a validated Oak Park Bloods gang member. While some content was missing, the People recovered messages from U. Williams the day before the murder forwarding pictures from social media showing a rival gang member claiming responsibility for T.W.'s death and otherwise disrespecting defendant's gang.

7

Finally, the People presented evidence of videos from defendant's phone. [FN8] One taken the day before the murder showed defendant with Carter rapping about the death of T.W. while using gang slang and displaying a handgun. Another video from August 22, 2017, showed defendant rapping inside the Buick with a box of 12-gauge shotgun shells in view.

[FN8] In addition to linking defendant to the Buick and guns/ammunition, this evidence aligned with Detective Saario's testimony that Oak Park Bloods members post on social media to taunt and disrespect their rivals.

D.    *Shotgun evidence*

Presumably to show that defendant had access to a shotgun, the People presented evidence that in August 2015, defendant was seen brandishing a sawed-off shotgun on a regional transit train. Defendant fled the train, but was followed by a sheriff's department helicopter and ultimately contacted by an officer when he entered a hotel room. A search of that room revealed an unloaded short-barreled 12-gauge shotgun found within a backpack that also contained defendant's Social Security card. Defendant admitted a friend had given him the shotgun for protection, but denied showing it to anyone on the train.

Further, defendant's ex-girlfriend R. Jackson told authorities in August 2017, and again after Campbell's murder, that defendant brandished a shotgun during an argument with her. However, at trial, Jackson denied that he had possessed a gun during the August 2017 argument. Detective Todd Culp confirmed speaking with Jackson, who had told him that defendant pulled out a pistol-gripped shotgun from a closet during the altercation with her in August 2017.

In their closing argument, the People theorized defendant committed premeditated retaliatory murder. Campbell was killed by defendant, who was in rival gang territory looking to avenge T.W.'s murder. Further, the surveillance footage and the witness testimony showed the person driving the Buick killed Campbell. Finally, because defendant wore the distinctive Cookie sweatshirt, he was identifiable as the person driving the car and thus had committed the murder.

The jury found defendant guilty on all counts and found true the gang and firearm enhancement allegations, including that defendant had personally and intentionally discharged the firearm proximately causing the death of the victim. (§ 12022.53, subd. (d).)

Defendant's bifurcated court trial on the sentencing enhancements and sentencing were both held on the same day. The trial court determined the prior strike and serious felony enhancements were true. The court then denied defendant's request for probation, as well as his request to strike the prior strike allegation, but did strike the prior serious felony enhancement. The court sentenced him to an aggregate term of 10 years, plus 75 years to life in prison. This sentence was calculated as follows: 25 years to life for count one, doubled because of the prior strike, plus 25 years to life for the section 12022.53, subdivision (d) enhancement, plus 10 years determinate for the gang enhancement. The court imposed but stayed sentences for the remaining counts pursuant to section 654. Defendant timely appealed, and appellate briefing in this matter was completed on August 22, 2022.

ECF No. 20-4.

1    In his petition, Petitioner mostly copies his attorney's brief to the California

2  Supreme Court, with parts of the California Court of Appeal's opinion interspersed throughout.

3  And at the end, however, Petitioner suggests alternate facts that differ from the facts above:[1]

> [Presumably before the murder,] once I came back to Sacramento, I took the sweater off and left it on the back of the couch in the living room because I could not fit it, my friend ask[e]d to keep it, and I was about to have sex with my girl. (Let me note that the sweater belongs to my friend who was arrested while we were down in [San] Fr[anc]isco. He's a lot smaller than me. When we had the car trouble, I put it on because it was very cold and late at night cold too. . . . My friend [] (the person in video after the killing) asked to use the car and take his little brother and his girl home. I let him and didn't see him until later. And when I did I was informed about the killing and freaked out. . . . But "I" did[]n't kill anyone. . . . The sc[ene] at the time "my" car was at the house, when my car was said to be seen on camera making a U-turn [the] V[ictim] was seen riding past on his bike. That contradicts the court's theory or proof that my car was even [i]nvolved in the manner "they" say it was.

> ECF No. 11, at 26-28.

13    Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a

14  State court shall be presumed to be correct." Accordingly, the facts outlined in the last reasoned

15  state court decision—here, the California Court of Appeal's opinion on direct review—are

16  entitled to a presumption of correctness by this Court unless rebutted by clear and convincing

17  evidence.  See Runningeagle v. Ryan, 686 F.3d 759, 763 n.1 (9th Cir. 2012).  Petitioner bears the

18  burden of rebutting this presumption. See id.  Here, Petitioner has not satisfied this burden

19  because his claim that an unspecified "friend" borrowed his sweater and vehicle on the night of

20  the murder—both of which were used to identify Petitioner as the shooter that night—as

21  Petitioner "was about to have sex with [his] girl" does not amount to evidence "so clear as to

22  leave no substantial doubt [and] sufficiently strong to command the unhesitating assent of every

23  reasonable mind." See Casey v. Metro. Life Ins. Co., 688 F. Supp. 2d 1086, 1101 (E.D. Cal.

---

[1]    While Petitioner does not formally challenge the factual determinations of the state court, "[p]risoner pro se pleadings are given the benefit of liberal construction," Porter v. Ollison, 620 F.3d 952, 958 (9th Cir. 2010) (applying this rule to a habeas corpus petition). Petitioner is proceeding pro se and without the benefit of informed counsel. See ECF No. 11, at 27-28 ("I don't know how to file a writ or what's allowed to be put in it but I'm doing the best I can. Please help me. I'm innocent. . . . The appeals court . . . stated I needed to file a federal writ for complete reversal and remand."). Accordingly, Petitioner's first amended petition for a writ of habeas corpus will be considered as if Petitioner is disputing the factual determination of the state court.

9

1    2010) (defining clear and convincing evidence in such terms) (alteration in original). Therefore,

2    the Court finds that Petitioner's alternative facts have not rebutted the California Court of

3    Appeal's factual determination that Petitioner was wearing the sweater and driving the car at the

4    time of the murder, especially given the video evidence (described by that court) showing

5    Petitioner wearing the sweater while using the vehicle before the murder. See ECF No. 20-4, at 5.

6    This Court must presumes as correct the facts drawn from the state court's opinion.

7         **B.    Procedural History**

8              On May 8, 2022, Petitioner timely appealed his jury conviction. See ECF No. 20-

9    5, at 1. On December 30, 2022, the California Court of Appeal, Third Appellate District, rendered

10   an unpublished decision vacating and remanding the judgment in part and affirming the judgment

11   in part. See ECF No. 20-4, at 1. Specifically, the Court of Appeal vacated the section 186.22

12   enhancements, subject to retrial on remand, but left unchanged the jury's remaining verdicts and

13   found the failure to bifurcate the procedure under section 1009 to be harmless (withholding

14   decision on whether the newly enacted bifurcation procedure under section 1009 applied

15   retroactively to Petitioner's case). See id. at 2. On March 21, 2023, the California Supreme Court

16   denied Petitioner's petition for direct review. See ECF No. 20-19.

17             On March 25, 2024, Petitioner filed this Petition for a writ of habeas corpus in this

18   Court. See ECF No. 1. On May 8, 2024, this Court dismissed Petitioner's petition and ordered

19   him to file an amended petition on the form employed by this Court which names the proper

20   respondent and states all claims and requests for relief. See ECF No. 9. On June 7, 2024,

21   Petitioner filed his First Amended Petition for a writ of habeas corpus. See ECF No. 11. This

22   petition pled two grounds for relief: a claim of structural error for failure to bifurcate Petitioner's

23   trial, see id. at 5, and a claim of ineffective assistance of counsel. See id. at 7.

24             On August 9, 2024, Respondent filed a Motion to Dismiss arguing that Petitioner's

25   second claim of ineffective assistance of counsel, and only that claim, was unexhausted. See ECF

26   No. 16, at 2. On September 13, 2024, Petitioner moved to voluntarily dismiss his second ground

27   of ineffective assistance of counsel. See ECF No. 18. On September 20, 2024, this Court granted

28   Petitioner's request for voluntary dismissal, denied Respondent's motion to dismiss as moot, and

1   directed Respondent to file and answer to Petitioner's amended petition (now limited to a single

2   claim of structural error for failure to bifurcate Petitioner's trial). <u>See</u> ECF No. 19. After filing a

3   Notice of Lodging, <u>see</u> ECF No. 20, Respondent filed the instant Answer on October 18, 2024.

4   <u>See</u> ECF No. 21.

5

6                              **II.  DISCUSSION**

7              As discussed above, this case proceeds on the amended petition on Petitioner's

8   first claim that the state trial court erred in not bifurcating the trial as to sentencing enhancements

9   pursuant to California Penal Code § 1109.  <u>See</u> ECF No. 11.  Respondent argues that this claim is

10  not cognizable on federal habeas review because it involves purely state law issues.  <u>See</u> ECF No.

11  21.  Respondent also argues that Petitioner's second claim is unexhausted because his passing

12  reference to due process does not squarely present a federal question to the state courts and

13  because Petitioner did not raise any due process argument in the intermediate state appellate

14  court.  <u>See id.</u>  For the reasons discussed below, the Court reaches the merits of Petitioner's

15  claims and finds that the state court's denial was neither contrary to nor based on an unreasonable

16  application of clearly established federal law.

17                    **A.     <u>Petitioner has Presented a Cognizable Federal Claim</u>**

18             A writ of habeas corpus is available under 28 U.S.C. § 2254 only based on a

19  transgression of federal law binding on the state courts.  <u>See</u> <u>Middleton v. Cupp</u>, 768 F.2d 1083,

20  1085 (9th Cir. 1985); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983). This includes "a

21  decision that was contrary to, or involved an unreasonable application of, clearly established

22  federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

23  The writ is not available for alleged error in the interpretation or application of state law.

24  <u>Middleton</u>, 768 F.2d at 1085; <u>see also</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir. 1987); <u>Givens</u>

25  <u>v. Housewright</u>, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try

26  state issues de novo.  <u>See</u> <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

27  / / /

28  / / /

11

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

Here, Petitioner argues that the failure to bifurcate his trial amounted to a violation of his Sixth Amendment right to a reliable jury verdict by including prejudicial testimony about Petitioner's gang affiliation, and that the state courts erred in failing to apply the federal "beyond a reasonable doubt" standard in evaluating the harmlessness of the alleged constitutional error, as required under Chapman v. California, 386 U.S. 18 (1967). See ECF No. 11, at 5.

As the Supreme Court articulated in Chapman v. California:

> The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law. But . . . when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied.

386 U.S. 18, 21 (1967).

Petitioner argues that the failure to bifurcate his criminal trial infected it with prejudicial evidence about his gang affiliation which frustrated his Sixth Amendment right to a reliable jury determination of the charges. If Petitioner is correct, this amounts to a state failure to accord a federal constitutionally guaranteed right—that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . an impartial jury," see U.S. Const. amend. VI. The issue, therefore, is not whether Petitioner's trial was required to be bifurcated under state law—the California Supreme Court ruled that it was not, see People v. Burgos, 16 Cal. 5th 1 (2024), and this Court cannot question that—but instead, whether the failure to bifurcate the trail, however

1    acceptable under state law, violated Petitioner's Sixth Amendment right to a reliable jury verdict.

2    While the Supreme Court in <u>Chapman</u> acknowledged that "that there may be some

3    constitutional errors which in the setting of a particular case are so unimportant and insignificant

4    that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the

5    automatic reversal of the conviction," 386 U.S. at 22, it also specified "that before a federal

6    constitutional error can be held harmless, the court must be able to declare a belief that it was

7    harmless beyond a reasonable doubt." <u>Id.</u> at 24. Coming, as it does, from our nation's highest

8    court, the <u>Chapman</u> "beyond a reasonable doubt" harmless error standard to evaluate federal

9    constitutional error is "the supreme Law of the Land; and the Judges in every State shall be bound

10   thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S.

11   Const. art. VI, cl. 2 ("Supremacy Clause"). Accordingly, by challenging the state court's decision

12   to not apply <u>Chapman</u>, Petitioner challenges "a decision that [he alleges] was contrary to, or

13   involved an unreasonable application of, clearly established federal law, as determined by the

14   Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner thus presents a

15   cognizable federal claim that this Court can review. This is regardless of whether Petitioner is

16   correct on the merits, to which this Court now turns.

17         **B.**    <u>**The State Court Was Correct in Not Applying The Chapman Standard**</u>

18   While applying the <u>Chapman</u> standard may be mandatory for state courts, the

19   United States Supreme Court has suggested that it is only required if the alleged error "infused

20   the trial with unfairness as to deny due process of law," <u>Estelle v. McGuire</u>, 502 U.S. 62, 75

21   (1991). Accordingly, state courts are only required to apply the federal "beyond a reasonable

22   doubt" harmlessness standard if the alleged error rendered the trial "fundamentally unfair," and

23   are free to apply their own state-law standards for errors that do not rise to that level. <u>See</u> <u>Reyes v.</u>

24   <u>Matteson</u>, 2023 WL 8623032 (E.D. Cal. Dec. 13, 2023), <u>report and recommendation adopted,</u> WL

25   626066 (E.D. Cal. Feb. 14, 2024) (noting that "review for harmlessness beyond a reasonable

26   doubt is only required when "there is [a] due process violation" that "rendered the trial

27   fundamentally unfair" and upholding that state courts' application of the California "reasonable-

28   probability-for-a-more-favorable-result standard" in denying a habeas petition).

1        Having reviewed the record of the state court proceedings as lodged in this Court,

2    see ECF No. 20, the failure to bifurcate cannot be said to have rendered Petitioner's criminal trial

3    "fundamentally unfair," thereby obviating the necessity to apply Chapman and precluding this

4    Court from finding any permissible grounds to grant Petitioner the requested relief by way of a

5    writ of habeas corpus.

6        The California Court of Appeal—whose decision was left intact by the California

7    Supreme Court when it denied Petitioner's request for review, see ECF 20-19—articulated the

8    following reasons for finding that the failure to bifurcate Petitioner's trial was harmless:

9        Defendant further argues newly enacted section 1109 requires
    reversal of both his enhancements and the convictions attached thereto.
10   We disagree. While there is a split of authority on the retroactivity of
    section 1109 (Tran, supra, 13 Cal.5th at p. 1208), we need not decide that
11   issue because we conclude that even if section 1109 applied retroactively,
    any error in failing to bifurcate was harmless.
12       As explained in Tran, supra, 13 Cal.5th at page 1208, the trial
    court's failure to bifurcate does not constitute structural error requiring
13   automatic reversal. Nor do we believe that it would be appropriate to
    assess the failure to bifurcate utilizing the Chapman [FN9] standard for
14   federal constitutional error because, under the circumstances of this case,
    that failure did not result in a trial that was "'fundamentally unfair.'"
15   (Tran, at p. 1209.) Accordingly, like the high court in Tran, we will weigh
    the possible prejudice of the trial court's failure to apply section 1109 for
16   state law error under People v. Watson (1956) 46 Cal.2d 818. (Tran, at p.
    1209.)
17
    [FN9] Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705].
18

19       Here, defendant has not shown it is reasonably likely that the jury
    would have come to a different result had the gang enhancements been
20   bifurcated. "[N]othing in Assembly Bill 333 limits the introduction of
    gang evidence in a bifurcated proceeding where the gang evidence is
21   relevant to the underlying charges." (People v. Ramos (2022) 77
    Cal.App.5th 1116, 1132.) Before trial, the court denied defendant's motion
22   to bifurcate the gang enhancements, highlighting that the People's theory
    of the case included gang motivation and finding that bifurcating the gang
23   evidence would improperly restrict the People's presentation of their case.
    Thereafter at trial, and as described in detail ante, the People presented
24   evidence intended to establish that defendant committed the murder in
    rival gang territory in retaliation for the killing of his friend and fellow
25   gang member T.W. the day before. Consistent with this evidence, the
    People argued in closing that defendant had committed premeditated
26   retaliatory murder. Campbell was killed because defendant, in rival gang
    territory, was looking to avenge T.W.'s murder. Moreover, the gang
27   evidence presented at trial that was not relevant to the People's theory of
    motive was minimal and unlikely to have impacted the result.

28

14

1

2

3

4

Further, a review of the remaining evidence presented against defendant does not suggest a reasonable probability that the jury would have come to a different result. Rather, compelling surveillance video and witness testimony established defendant was driving the Buick down the street where the shooting occurred, made a U-turn in that vehicle, and then fled the scene following the ShotSpotter alert. That Buick was later determined to contain gunshot residue, suggesting a gun was fired from the car.

5

6

7

8

9

Moreover, defendant's companion in the Buick that night attempted to livestream news of the shooting within 45 minutes of the murder, and incriminating text messages between defendant and Williams, as well as their social media activity, suggested defendant's involvement in the murder. Against this backdrop, the jury determined defendant *personally* and intentionally fired the firearm killing Campbell. Accordingly, we find defendant has not shown it is reasonably likely the jury would have reached a different outcome had the gang enhancement been bifurcated, and thus, we conclude that reversal of defendant's substantive convictions is not warranted.

10

11

ECF No.20-4, at 12-13.

12

This Court agrees with the California Court of Appeal that applying the federal

13

"beyond a reasonable doubt" standard of harmlessness under <u>Chapman</u> was not required. This

14

Court has previously held that in the context of bifurcation under section 1109—the same law

15

Petitioner bases the instant challenge on—"[e]vidence of gang affiliation—including evidence of

16

the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises,

17

rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of

18

applying force or fear, or other issues pertinent to guilt of the charged crime." <u>Reyes</u>, 2023 WL

19

8623032, at *9.  In turn, the United States Supreme Court has held that if "evidence was relevant

20

to an issue in the case . . . [Petitioner's] due process rights were not violated by the admission of

21

the evidence." <u>Estelle v. McGuire</u>, 502 U.S. 62, 70 (1991). Accordingly, as long as the "evidence

22

here was properly admitted"—which Petitioner does not dispute—"there is no reason to conclude

23

it rendered the trial fundamentally unfair." <u>Reyes</u>, 2023 WL 8623032, at *9.

24

Here, the state court explained that the expert testimony of gang-affiliation was

25

introduced "[i]n accordance with the People's theory that the crime was a retaliatory gang

26

killing." As such, it constituted evidence that was relevant to an issue in the case, specifically

27

motive. And because there is no indication that the evidence was improperly admitted, there is no

28

reason to conclude that the trial was rendered fundamentally unfair by its inclusion. Therefore,

1   because the trial was not rendered fundamentally unfair by the inclusion of the testimony relating

2   Petitioner's gang-affiliation, the California Court of Appeals was correct in deciding not to apply

3   Chapman, bound as it was by precedent from the California Supreme Court. See People v. Tran,

4   13 Cal. 5th 1169, 1209 (2022). There is, therefore, no unreasonable application of clearly

5   established federal law, which compels this Court to deny Petitioner's request for habeas relief.

6          Moreover, because habeas cannot be used to try state issues de novo, see Milton v.

7   Wainwright, 407 U.S. 371, 377 (1972), this Court cannot review the state court's application of

8   the "reasonable-probability-for-a-more-favorable-result standard" because its application is a

9   matter of state law. See 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a

10   writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court

11   only on the ground that he is in custody in violation of the Constitution or laws or treaties of the

12   United States.") (emphasis added). However, as it has done in the past, this Court will note that

13   the other evidence admitted against Petitioner—namely, the surveillance video showing Petitioner

14   driving the vehicle on the night of the murder; the witness testimony connecting Petitioner to the

15   vehicle, the shooter's distinctive sweatshirt, and the shotgun; the gunshot residue on the drivers'

16   side door; and Petitioner's social media posts, internet searches, and text messages—suggests that

17   any error resulting from a failure to bifurcate the trial would likely also have been found to have

18   been harmless under the federal beyond a reasonable doubt standard. See, e.g., Aguilera v.

19   Burton, 2025 WL 1039775, at *14 (E.D. Cal. Apr. 8, 2025) ("In light of all the properly admitted

20   evidence, we conclude the trial court's error . . . was harmless under either the Watson or the

21   Chapman standard.") (emphasis added). Considered alongside the fact that "the gang evidence

22   presented at trial that was not relevant to the People's theory of motive was minimal and unlikely

23   to have impacted the result," the state court's assessment of harmlessness was likely correct.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

**IV.  CONCLUSION**

Based on the foregoing, the undersigned recommends that Petitioner's first amended petition for a writ of habeas corpus, ECF No. 11, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  May 16, 2025

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

17